# Herman A. Dreiske et al. v. The Jones & Adams Company.

## Gen. No. 13,052.

1. DEPOSITION—*what evidence contained in, may be objected to at trial.* Statements in a deposition which are not legitimate evidence may be objected to at the trial, but all objections to evidence contained in a deposition which could have been cured had they been made in apt time before the trial are deemed waived.

2. MEMORANDUM BOOKS—*kept by third party, when competent.* An entry in the books of a third party is admissible as an entry contemporaneous with the principal fact done, where it forms a link in the chain of evidence and is a part of the *res gestœ.*

3. MEMORANDUM BOOK—*when copy of contents of, competent.* Where the entries contained in a book kept by a third party are competent, a copy of such entries is admissible where the owner of such book refuses to produce the original.

Assumpsit. Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1906. Affirmed. Opinion filed April 30, 1907.

**Statement by the Court.** This is an appeal by the defendants from a judgment for $1,019.83 recovered by the plaintiff in an action of assumpsit brought to recover the balance due for a cargo of coal sold and delivered by plaintiff to defendants.

The contract of sale is in writing as follows:

"Chicago, August 1, 1902.

Messrs. Dreiske & Hinners,
　　Elston Avenue and Blackhawk Sts.,
　　　　Chicago, Ills.

Gentlemen: In accordance with my conversation with you to-day, at which time I read you a letter from the president of the National Fuel Company, of Columbus, Ohio, copy of which I attach. I write you in order that there may be no misunderstanding confirming my verbal agreement, which is to the effect that we are to ship you about 1200 tons of Hock-

ing coal, the grade as known by the shipper 'Steam Lump.' This grade to contain the Lump, Nut and Pea Coal.

Price to be $1.95 per ton f. o. b. vessel Sandusky.   Bill of lading weights to govern settlement.   Payment cash thirty days.   You to pay vessel freight on arrival of cargo, and we through our vessel agents at Cleveland to secure you best rate obtainable at the time of shipment.

I make this letter in duplicate, and if you will kindly return one copy properly signed, we will wire the mines to assemble the cargo, also, our vessel agent to secure a boat.

Very truly yours,<br>
THE JONES & ADAMS CO.,<br>
per H. C. Adams, V. pres't.

Accepted:
   Dreiske & Hinners."

The copy of the letter in said contract referred to and thereto attached is as follows:

"Columbus, Ohio, July 31, 1902.

Copy.
H. C. Adams, V. P.
 Jones & Adams Co.,
  Chicago, Ills.

Dear Sir:   Referring to your request for cargo of ¾" or 1½" Hocking: I have been out of the city for several days. On receipt of your letter yesterday Mr. Evans wired you naming price.

In answer to your letter of the 30th we wired you to-day that it would take about a week to accumulate a small cargo of about 1200 tons and also that if we load the cargo at all we would have to load steam lump (or lump, nut and pea) instead of ¾", owing to the fact that this is the grade we are loading right along and have on track at Sandusky and with our small output it would jeopardize our car supply if we attempted to accumulate a different grade.   This of course is the same coal original telegram referred to, but I have explained it so you will understand more fully what the coal is.

We have in the neighborhood of 700 tons on track at Sandusky to-day, and if you wire immediately on receipt of this we could save this for your cargo and ship enough in

a day or so to load a boat of a thousand or twelve hundred tons.

Please advise us as soon as possible or otherwise this coal will be loaded elsewhere.

Very truly yours,

THE NATIONAL FUEL CO.,

S. M. Comly, Pres't."

That the plaintiff caused to be shipped at Sandusky, Ohio, August 16, 1902, by the Steamer New Orleans, to defendants at Chicago 2,074½ tons of Hocking coal and advanced $5.70 for insurance, is not disputed. At the contract price this amounted to $4,058.98. Defendants paid on account $3,000, leaving a balance due if the coal was of the kind and grade specified in the contract of $1,058.98. The only controverted question of fact in the case is as to the kind and grade of the coal.

The case was submitted to the court. Plaintiff's evidence tends to show that 20 cars, 623 tons, was run of mine coal, worth 5 cents per ton less than steam lump, the grade specified in the contract, and the remainder of the cargo was steam lump or better. Five cents per ton on 623 tons amounts to $31.75. The trial court deducted this amount from $1,058.98, and for the balance, $1,019.83, gave judgment.

KICKHAM SCANLAN, for appellants.

RUNNELS & BURRY, for appellee.

MR. JUSTICE BAKER delivered the opinion of the court.

The term "steam lump" as used in the contract refers to the coal as it was when loaded into cars at the mine. Steam lump includes all the coal except that which passes through a half inch screen at the time. That part which passes through such screen is called slack, dust, or screenings. Coal that is steam lump when put on board cars at the mine remains steam lump after transportation, although in transportation and in loading and unloading more or less lump

coal is necessarily broken up and converted into slack or dust.  Mine run coal includes the slack and dust, and is the grade next below steam lump.  Lump, three quarter lump, domestic lump and Milwaukee lump are all grades better than steam lump.

The question is, what was the kind or grade of the coal in question when it left the mines.  The coal was shipped from the mines to Sandusky by the C. S. & H. R. R., consigned to the National Fuel Company, and was unloaded from the cars into the vessel by the superintendent of the docks at Sandusky.  To show the kind and grade of the coal in question when shipped at the mines, it was proper to prove what cars were unloaded into the vessel at Sandusky, from what mines such cars were shipped, and then to show with what kind and grade of coal such cars were loaded at the mines.

Plaintiff took in Ohio, upon oral interrogatories, the depositions of the superintendent of the dock at Sandusky and of persons connected with the mining and shipping of the coal at the mines.  Defendants did not attend upon the taking of the depositions, nor move to suppress any part thereof, but at the trial, objected to parts of such depositions, and the overruling of such objections is assigned for error here.

The rule of law in such cases is well settled.  Statements in a deposition which are not legitimate evidence may be objected to at the trial, but all objections to evidence contained in a deposition which could have been cured had they been made in apt time before the trial are deemed waived.

In C. & N. W. R. R. Co. v. Ingersoll, 65 Ill., 399, a railroad company was sued for the non-delivery of grain to the consignee of the plaintiff, and the defense of the company was that by order of the consignee, it had delivered the grain to a certain elevator which was burned the following day.  The defendant offered in evidence an entry in the books of the elevator company made in the usual course of its business by its foreman, tending to show that the grain in question was received into the elevator the day before the fire, and it

was held that such entry in the books of a third party was admissible as an entry, "contemporaneous with the principal fact done, forming a link in the chain- of events and being a part of the *res gestœ.*" 1 Greenleaf on Ev., section 120.

In Fisher v. Greene, 95 Ill., 94, it was held that when an original paper is in the hands of a third person residing out of the State and he refuses to attach the same to his deposition, a sworn copy thereof, attached to his deposition, as an exhibit, is admissible in evidence.

Plaintiff read in evidence the deposition of Chester C. Hand, the superintendent of the docks at Sandusky. He testified that he superintended the loading of the coal in question at said dock from the cars into the Steamer New Orleans; that he made in a book a record of every car of coal that went into the vessel; that the book produced contained such entries in his handwriting; that he would not permit the book to be attached to his deposition; that the copy of such entries which he produced and which was attached to his deposition as an exhibit was a correct copy of the original.

We think the court did not err in admitting in evidence such exhibit. This exhibit contains the date and number of the way bills, the number of the car and weight of the coal of the 73 cars of coal that made up the cargo. Hand further testified that he inspected said 73 cars of coal by looking at the coal before it was unloaded; that the coal that went into said cargo was run of mine, lump and nut; that no car of slack or screenings went into the cargo.

J. H. Gray testified in his deposition that he was the superintendent of National Fuel Company's mine 34, in Perry county, Ohio, in 1902; that he kept in his own handwriting a record of the cars of coal shipped to Sandusky by said company from June 10 to August 15, 1902; that said record contained the date of shipment, number of the car, weight and kind of coal; that he would not permit such record to be taken out of the State, but produced a true copy thereof which was attached to his deposition as an exhibit. This exhibit was, we think, properly admitted in evidence. From this exhibit it appears that said company shipped to

its own order at Sandusky, within the dates above mentioned, 59 cars of coal, nearly all of which cars, from a comparison of the exhibit attached to his deposition with that attached to Hand's deposition, appear to have gone into the cargo in question.

According to said exhibit, 16 of said cars contained run of mine coal, the others steam lump or better, viz.: 19 steam lump, 3 domestic lump, and the remainder of the 59 cars Milwaukee lump. He further, after refreshing his memory by an examination of said sheet, testified that 16 of said cars were loaded with run of mine coal, 19 with steam lump, 2 with domestic lump and the remainder with Milwaukee lump. John Carding testified that he shipped car 9422 June 13, and car 3643 August 8, 1902, to said Fuel Company at Sandusky, and that both cars were steam lump. Both of said cars appear from the exhibit attached to Hand's deposition to have gone into the cargo of the New Orleans.

M. L. Swingle testified by deposition that he was the station agent of the C. S. & H. R. R. Co. at Canelsville, Ohio, in August, 1902, and was also employed by Maynard Brothers to make up their mine reports and do their billing; that he made up such reports from slips furnished him by Mauk, the superintendent of the mine of Maynard Brothers; that the book produced contained the report of the shipments made in August, 1902; that he would not permit the book to be taken out of the State, but would furnish a copy of said report to be attached to his deposition, and a copy thereof is attached to his deposition as an exhibit. Swingle further stated, after refreshing his memory by an examination of said report, the number of each car so shipped, which numbers correspond with the numbers contained in the report. Mauk testified that he was the superintendent of the Maynard mine in August, 1902; that during that month he superintended the loading of ten cars of coal consigned to the National Fuel Company at Sandusky; that he made an inspection of each car to ascertain the kind of coal in it, put the name and number of the car and the kind of coal in it on a slip and gave such slip to Swingle.

37

We think the exhibit attached to the deposition of Swingle was admissible in evidence, although his original report was made from slips furnished him by Mauk. The entries so made were still contemporaneous entries, made in the usual course of business, forming a link in the chain of events and being a part of the *res gestæ*. I Greenleaf's Ev., section 120. From said exhibit it appears that said ten cars contained run of mine coal, and from a comparison of said exhibit with the Hand exhibit, it appears that five of said cars went into the cargo of the New Orleans.

The testimony contained in said deposition and the exhibits thereto attached show, with reasonable certainty, from what mines the coal that made up the cargo of the New Orleans came; when each car was shipped, and tends to show that the coal in 21 of the cars that went into said cargo, viz.: 16 of those from mine 34 of the National Fuel Company and 5 shipped from the mine of Maynard Brothers, was run of mine coal, and that the coal in the other cars that went into said cargo was steam lump or better.

The testimony of the defendants' witnesses relates to the condition of the coal and the amount of dust or slack therein after it had been unloaded upon the dock at Chicago. None of the witnesses had had experience in shipping Hocking coal by rail and lake, but only in shipping it by rail.

The testimony was competent only so far as evidence of the condition of the coal in Chicago tended to show its condition when shipped from the mine.

The evidence tends to show that the coal dropped 20 to 22 feet in loading at Sandusky, and 22 feet in unloading at Chicago when unloading began. The evidence also shows that in shipping Hocking coal by lake and rail a very much larger percentage of the coal is broken up and converted into slack or dust than is so broken up and converted in shipping by rail alone.

We do not think that the evidence given for defendants as to the condition of the coal in Chicago is sufficient to overcome the evidence on the part of the plaintiff as to the kind and grade of the coal when it was shipped from the mines.

Upon the question whether H. C. Adams, an officer of the plaintiff company, admitted to Mr. Dreiske, one of the defendants, that the coal was inferior to that specified in the contract, the evidence is conflicting.

The finding cannot, in our opinion, be held to be against the evidence, and we find in the rulings of the court upon evidence no reversible error.

The judgment of the Circuit Court will be affirmed.

*Affirmed.*